**LOCAL NO. 3, UNITED PACKING-HOUSE WORKERS OF AMERICA, CIO**

v.

**NATIONAL LABOR RELATIONS BOARD et al.**

**WILSON & CO., Inc.**

v.

**NATIONAL LABOR RELATIONS BOARD.**

**Nos. 14876, 14883.**

United States Court of Appeals, Eighth Circuit.

Feb. 16, 1954.

Rehearing Denied March 9, 1954.

Allen Heald, Cedar Rapids, Iowa, for Local No. 3, United Packinghouse Workers of America, CIO.

John L. Cockrill, Chicago, Ill. (Thomas Freeman, Louis R. Simpson, Howard C. Parson, Chicago, Ill., and Francis X. Reilly, Jr., Chicago, Ill., on the brief), for Wilson & Co., Inc.

Irving M. Herman, Atty., N. L. R. B., Washington, D. C. (George J. Bott, Gen. Counsel, N. L. R. B., David P. Findling, Associate Gen. Counsel, N. L. R. B., A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., and Frederick U. Reel, Atty., N. L. R. B., Washington, D. C., on the brief), for National Labor Relations Board.

Before GARDNER, Chief Judge, and THOMAS and COLLET, Circuit Judges.

GARDNER, Chief Judge.

This was a proceeding before the National Labor Relations Board in which Locals 3, 6 and 37 of the United Packinghouse Workers of America, CIO, filed charges with the National Labor Relations Board in the fall of 1948 alleging that Wilson & Co., Inc., the owner and operator of meat packing plants at Faribault, Minnesota, at Albert Lea, Minnesota, and at Cedar Rapids, Iowa, had discriminatorily discharged and refused to reinstate certain named employees whom the unions represented for collective bargaining purposes because of their union activities and affiliations and had failed to reinstate them for like reasons. While the original charges were filed in the fall of 1948 no complaint was issued by the National Labor Relations Board based thereon until June 27, 1952, nearly four years after the filing of the original charges.

Strikes occurred and were carried on at each of the company's plants from March 16, 1948, until June 7, 1948, and were conducted in such a violent and destructive manner that the governor of the state of Minnesota and the governor of the state of Iowa each called out the National Guard of his respective state to protect the company's property, preserve the public peace and prevent threatened damage to persons and property by the striking employees. Injunctions against the strikers were also issued for like reasons.

The complaint as finally issued upon the charges filed alleged that the company had discharged and failed and refused to reinstate certain named employees because they had engaged in a strike and other concerted activities for the purpose of collective bargaining or other mutual aid or protection, with the intent to discourage membership in the local unions and the concerted activities of its employees. The complaint then alleged that the company's acts constituted discrimination in regard to hire and tenure of employment and terms and conditions of employment of its employees and for that reason constituted unfair labor practices within the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

The company by its answer denied all charges of unfair labor practices contained in the complaint, pleaded that the strike was an unlawful one because it had been called before the expiration of the contract between the company and its employees and that because of such action they lost their status as employees.

The answer also affirmatively pleaded that the employees named in the complaint were denied re-employment for illegal or unlawful acts or misconduct during or after the strike or for permitting reinstatement rights to lapse or for failure to report for work after the strike on proper notice or were not employees at the start of the strike, and not be-

cause of their union activities or affiliations. It was also alleged that the complaint contained names of certain individuals whose claims had been fully settled and released in accordance with an agreement of October 5, 1950, between the company and the union with the approval of representatives of the National Labor Relations Board.

The case was heard before a trial examiner of the Board who heard the testimony on the issues presented.

The Board, in support of the allegations of its complaint, introduced evidence showing that the individuals enumerated in the complaint as having been discriminatorily refused reinstatement because of their union activities were employees of the company at and prior to the time the strike was called; that they participated in the strike; that they were members of the union and that following the strike they reported for work and were denied employment. The company introduced evidence as to the acts of violence committed by the striking employees and evidence tending to show that the employees named in the complaint participated in certain unprotected activities in connection with the strike. The acts of violence shown by the testimony included tipping over automobiles of non-striking employees or supervisors, threatening non-striking employees or supervisors with bodily harm, blocking ingress to or egress from company plants, assaulting non-striking employees or supervisors, throwing rocks at non-striking employees or supervisors, and publicly vilifying supervisors or non-striking employees. It also made proof that other employees who had participated in the strike but who had not taken part in these unprotected activities were reinstated although they were equally prominent in the union and its activities. The company also offered proof that as to five of the employees listed in the complaint two were discharged or refused reinstatement for failure to report to work after the strike, one was discharged for walking off his job, one was discharged or refused reinstatement for failure to make timely return from a leave of absence, and one was refused reinstatement because his job had been eliminated.

The trial examiner in his report to the Board rejected all the company's defenses and found that the company had violated Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act as to all individuals named in the complaint and recommended that the company be ordered by the Board to cease and desist from interfering with employees' rights and to reinstate and make whole each of the individuals named in the complaint.

The Board adopted the findings and recommendations of the examiner except as to one Harry L. Wright as to whom the proceeding was dismissed because he had been discharged for leaving his work before his regular relief time and not for his union activities or affiliations.

It will be necessary to make further reference to the evidence in this case during the course of this opinion.

Subsequent to the entry of the order of the Board, Local No. 3, United Packinghouse Workers of America, CIO, was on application permitted to intervene for the purpose of filing petition for review. Petitions for review have been filed by the company and also by Local No. 3, United Packinghouse Workers of America, CIO. The union in its petition seeks only a modification of the Board's order to the extent that the dismissal of the complaint as to Harry L. Wright be reversed and that he be included in the list of those to be reinstated with back pay and that the order be further modified so as to allow interest to such employees as are ordered reinstated, on the back pay which shall be found to be due them.

The company by its petition for review challenges the validity of the order and the findings on which it is based substantially on all the grounds pleaded in its answer.

The burden of proving the charges of unfair labor practices charged

in the complaint was upon the Board. N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680; N. L. R. B. v. National Die Casting Co., 7 Cir., 207 F.2d 344; American Smelting & Refining Co. v. N. L. R. B., 8 Cir., 126 F.2d 680. The basis of these charges was that the dismissal of the employees named in the complaint and the refusal to reinstate them was because of their union activities or affiliations and hence, was discriminatory within the purview of the National Labor Relations Act. The jurisdiction of the Board is a limited one and it cannot concern itself with the management of the business of employers nor with the matter of discharges of employees unless such discharges are prompted by union activities or affiliations of the employees. If an employee is wrongfully discharged by his employer he must seek recourse in a court of law unless the discharge be for the union activities or affiliations of the employee. American Smelting & Refining Co. v. N. L. R. B., supra; N. L. R. B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486. In American Smelting & Refining Co. v. N. L. R. B., supra [126 F.2d 686], it was said:

"The Act gives the Board no supervisory powers over the conduct of a business, nor may it concern itself with the question of discrimination or wrongful discharge or other improper treatment of an employee, unless such acts were prompted by the employee's union activities or affiliations. The burden of proof on that issue rested upon the Board to show by substantial evidence that the employee was discharged because of such activities or affiliations."

The question of the right to reinstatement or re-employment depends on whether or not the employee was discharged or refused reinstatement for his union activities. If an employee has been discharged or refused reinstatement for other causes, whether justly or unjustly, he is not entitled to reinstatement by order of the Board. In other words, the Act does not confer upon the employee any right of reinstatement if he has been discharged or refused reinstatement for any reason other than his union activities or affiliations. It is therefore of paramount importance in this, as in other similar cases, to consider the entire record for the purpose of determining whether the finding that the discharges or refusals to reinstate the employees involved were prompted by their union activities or affiliations is sustained by substantial evidence. We have examined the evidence bearing on this question of the cause of discharge or refusal to reinstate each of the employees named in the complaint. As has been observed the burden of proof to establish affirmatively by substantial evidence that the discharges or refusals to reinstate were because of union membership and activities and for the purpose of discouraging membership in the union was upon the Board and this burden at no time shifted to the company. The fact that the employer may introduce evidence tending to show other reasons for discharge or refusal to reinstate does not mean that the employer has the burden of proof of establishing such alleged cause but the evidence is admissible and pertinent because it tends to disprove the allegations of the complaint. But whether such evidence be introduced or not it is still the duty of the Board to prove the allegations in the complaint by substantial evidence. There was evidence tending to prove that each of these employees, save five discharged for other reasons, participated in unprotected activities during the strike. True, the trial examiner found the evidence insufficient to sustain that charge. He did so by discrediting positive testimony in many instances and by crediting the negative testimony of the employee. The uniformity with which the examiner credited the negative testimony offered on behalf of the strikers and discredited the positive testimony offered on behalf of the employer regardless of the fact that the evidence of the employer was corroborated in most instances by the

surrounding facts and circumstances, convinces us of his bias and hostility. Parties to these proceedings are entitled to a fair, unbiased and impartial hearing. N. L. R. B. v. Phelps, 5 Cir., 136 F.2d 562; N. L. R. B. v. Acme-Evans Co., 7 Cir., 130 F.2d 477; N. L. R. B. v. A. Sartorius & Co., Inc., 2 Cir., 140 F.2d 203. In N. L. R. B. v. Phelps, supra, it is among other things said [136 F.2d 563]:

"* * * a fair trial by an unbiased and non-partisan trier of the facts is of the essence of the adjudicatory process as well when the judging is done in an administrative proceeding by an administrative functionary as when it is done in a court by a judge. Indeed, if there is any difference, the rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the safeguards which have been thrown around court proceedings have, in the interest of expedition and a supposed administrative efficiency been relaxed. Nor will the fact that an examination of the record shows that there was evidence which would support the judgment, at all save a trial from the charge of unfairness, for when the fault of bias and prejudice in a judge first rears its ugly head, its effect remains throughout the whole proceeding. Once partiality appears, and particularly when, though challenged, it is unrelieved against, it taints and vitiates all of the proceedings, and no judgment based upon them may stand."

The manifest prejudice, bias and hostility of the examiner as disclosed by an examination of the record goes far to weaken or destroy the presumption of correctness usually attributed to the findings of the trier of facts. A study of the entire record indicates that this bias and hostility prevailed not only in the weighing of the evidence but in the ruling of the court in rejecting pertinent evidence offered by the company. There was not only evidence tending to show participation in unprotected activities by the listed employees, save the five discharged or refused reinstatement for other reasons, but there were affidavits which had been furnished to the company before the refusal to reinstate these employees which in many instances positively connected these employees with acts of violence and it was shown without dispute that many outrageous acts of violence clearly beyond the bounds of legitimate strike activities had been committed. Indeed these had been perpetrated to such an extent and in such violence that it was necessary for the governors of the states where the plants are located to call out the militia of the respective states to quell mob violence and to prevent the destruction of property and the threat of injury to officers of the company and non-striking employees. These acts were confessedly committed by striking employees. Detailing the evidence with reference to the various acts of violence committed by the strikers and the evidence tending to connect the employees named in the complaint therewith, would extend this opinion to voluminous proportions and would serve no useful purpose.

Since the decision of the Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 464, 95 L.Ed. 456, it is incumbent upon this court in cases here on petition for review of an order of the National Labor Relations Board to consider the conflicting evidence and if it is our duty to consider it then we must pass upon its weight. In that case the court, referring to this question, said:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely pre-

cludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its *weight*. This is clearly the significance of the requirement in both statutes that courts consider the whole record." (Emphasis supplied.)

In this connection it is to be noted that many of the company's striking employees were members of the union and quite as active and prominent in its affairs as those listed in the complaint but they were not refused reinstatement but when the strike was over they were reemployed. It does not appear whether all of the company's employees are members of the union or not but certainly a majority of them are members of the union and there is no evidence indicating any antipathy of the company against the union.

■■ The evidence considered as a whole, including all the surrounding facts and circumstances, convincingly established that the company had reasonable grounds to believe that the named employees had engaged in the unprotected strike activities and that in reliance upon such belief refused to reinstate them. If they were so discharged then they were not entitled to reinstatement. N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370; Ohio Associated Tel. Co. v. N. L. R. B., 6 Cir., 192 F.2d 664; American Smelting & Refining Co. v. N. L. R. B., supra; N. L. R. B. v. Montgomery Ward & Co., supra; N. L. R. B. v. Stafford, 8 Cir., 206 F.2d 19, 22. In N. L. R. B. v. Stafford, supra, we said, "The fact in issue is the intent, motive or reason in respondents' mind for the discharge of the complainants." But quite aside from any proof produced by the company, a consideration of the record as a whole, in our judgment, fails to disclose any substantial evidence that the employees listed in the complaint were either discharged or refused reinstatement because of their union activities. As said by us in N. L. R. B. v. Montgomery Ward & Co., supra [157 F. 2d 491], "Fragmentary and unrelated suspicions are not sufficient in substance to transform a proper exercise of discharge into an improper one." There was no direct evidence that the acts of the company complained of were prompted by the union activities of the employees nor are there any proven facts warranting such inference, and mere suspicion or conjecture can not be accepted as substantial evidence. As the finding of the Board that the discharges and failures to reinstate the employees named in the complaint were because of their union activities is not sustained by substantial evidence, the order of the Board should not be enforced.

However, it is urged by the company that the Board was without jurisdiction in the matter because the strike was an unlawful one in that it had been called before the expiration date of the contract between the company and the union. The strike was called March 16, 1948, whereas the contract did not expire until August 11, 1948. The Labor Management Relations Act of 1947, Section 8(d), contains provisions reading in part as follows:

"Provided, that where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

\* \* \* \* \* \*

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such no-

tice is given or until the expiration date of such contract, whichever occurs later: * * *." 29 U.S.C. A. § 158(d).

Section 8(d) further provides that:

"Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9 and 10 of this Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer."

The strike was not called until after sixty days after the giving of the required notice. However, the expiration date of the collective bargaining contract between the company and the union expired later and hence it is argued that no strike could properly be called until after the expiration date of the contract. The Board strenuously argues that so construing the statute would to a considerable extent be destructive of its purpose. It is urged that so construed there could be no strike during the life of the contract between the employer and the union. That argument we think a very proper one to be addressed to the Congress and apparently it was urged upon Congress. Thus, if we may resort to legislative history despite the plain wording of the statute, it is observed that the Senate Committee on Labor and Public Welfare in its report among other things said:

"If unions can break agreements with relative impunity, then such agreements do not tend to stabilize industrial relations. The execution of an agreement does not by itself promote industrial peace. The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement there

is little reason why an employer would desire to sign such a contract.

* * * * * *

"Statutory recognition of the collective agreement as a valid, binding and enforceable contract is a logical and necessary step. It will promote a higher degree of responsibility upon the parties of such agreements, and will thereby promote industrial peace."

It also appears from the legislative history that Senator Taft made it clear that Section 8(d) required a waiting period before strikes and lock-outs *during the life of the contract* when he said:

"If such notice is given, the bill provides for no waiting period except during the life of the contract itself."

Senators Murray, Thomas and Pepper, members of the Senate Committee on Labor and Public Welfare, filed their Senate Minority Report No. 105, Part 2, 80th Congress, 1st Session, stating at page 22 thereof, in objecting to Section 8(d):

"Since not every collective-bargaining contract contains a no-strike clause, the effect of the proposal is to incorporate such provisions by legislative fiat. Although we believe that such provisions are eminently desirable, it is our further belief that such agreements should be reached voluntarily on friendly, valid collective bargaining. The sanction would then be that employees striking in violation of such an agreement would lose their right to reinstatement, as presently provided by both Board and Court decision."

Notwithstanding these arguments by opponents of the bill, however, it was passed by the Congress in its present form. It is not ambiguous and can not be amended by interpretation. In United Packing House Workers of America v. Wilson & Co., Inc., 80 F. Supp. 563, 569, involving the same con-

tract, the same union and the same strike here involved, the District Court for the Northern District of Illinois in addressing itself to this question said:

"* * * the complaint shows on its face that plaintiffs, by 'resorting to a strike' on March 16, 1948 and before the 'expiration date of such contract,' have violated the express mandate of Section 8(d) of the Labor Management Relations Act of 1947. Plaintiffs contend that their contract gave them the right to strike during its term. After the passage of the Labor Management Relations Act of 1947, such a contention would be contrary to the express policy of the Act and Section 8 thereof. Contracts, however, express, cannot fetter the constitutional authority of Congress. Norman v. Baltimore & Ohio R. R. Co., 294 U.S. 240, 307, 55 S.Ct. 407, 79 L.Ed. 885."

A somewhat similar question was considered by the Court of Appeals for the District of Columbia in Boeing Airplane Co. v. N. L. R. B., 85 U.S.App.D.C. 116, 174 F.2d 988, 990. In that case the employees had called a strike without giving notice as required by Section 8(d) of the Act. In the course of the opinion it is said:

"Congress made Section 8(d) applicable to all contracts which were in effect on August 22, 1947. Its purpose was to provide a cooling-off period prior to a work stoppage. * * * the strike was not a lawful strike because of its (the union's) failure to comply with Section 8(d) of the Act. * * * the Company was at liberty to treat the employees as having severed their relations with the Company because of their breach of contract, and it was further at liberty to consummate their separation from the Company's employ by hiring others to take their places. See National Labor Relations Board v. Sands Manufacturing Co., 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682."

We are of the view that by going out on strike before the expiration date of the collective bargaining contract the employees lost their status as employees of the company and hence they were not entitled to re-employment as a matter of right. As this disposes of the issues raised by the petition for review filed by the union, as well as the questions raised by the petition for review filed by the company, we pretermit a consideration of other contentions urged by the respective petitioners.

The order of the Board will therefore not be enforced and the cause is remanded to the National Labor Relations Board with directions to dismiss the proceedings.